# Compensation Plan

## Glacier Bay Commercial Fishing Compensation Program

### September 2001

## Glacier Bay National Park and Preserve




**United States Department of the Interior ∇ National Park Service ∇ Alaska Region**

Appendix _B_
Page _1_ of _26_

AR0000000141

# *Table of Contents*

*TABLE OF CONTENTS* ............................................................................... I

*INTRODUCTION* .................................................................................... 1

*BACKGROUND* ..................................................................................... 2

*THE COMPENSATION PLAN SUMMARY* ......................................................... 5

*PART I  ELIGIBILITY FOR COMPENSATION* ..................................................... 6

*PART II  DISTRIBUTION OF COMPENSATION AMONG CATEGORIES OF CLAIMANTS (SPLITTING THE COMPENSATION PIE)* ......................................................... 7

*PART III  MECHANICS OF THE COMPENSATION PLAN* ..................................... 10

*PART IV  COMPLEXITIES IN THE COMPENSATION PLAN* .................................. 15

*PART V CLAIM AND PAYMENT PROCESSES* ................................................. 16

*APPENDICES* ................................................................................... 24

*ECONOMIC ASSESSMENT EXECUTIVE SUMMARY* .......................................... I

Appendix *B*

Page __*2*__ of __*26*__

AR0000000142

# Introduction

**Dear Reader:**

After reviewing comments from the public and the State of Alaska this Compensation Plan has been developed by the National Park Service (NPS) to implement provisions of Section 123 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act (P.L. 105-277) as amended by Section 501 of the 1999 Emergency Supplemental Appropriations Act (P.L. 106-31). The law authorized and funded a $23 million compensation program to "fairly compensate United States fish processors, fishing vessel crew members, communities and others negatively affected by restrictions on fishing in Glacier Bay National Park."

This Compensation Plan was finalized from your comments and ideas on the range of options that were considered for apportionment of the $23 million compensation provided by Congress. The State of Alaska has assisted in gathering public input and other information that has been considered in the development of this plan. The purpose of this report is to:

- Provide background information.
- Outline eligibility criteria and compensation.
- Provide information on how to apply for compensation.
- Outline how compensation claims will be reviewed, qualifying applicants paid, and appeals adjudicated.
- Relate key questions that have been raised during public meetings.

**The goal of the compensation plan is to fulfill the intent of the law; to fairly compensate those negatively affected within the constraints of the available funding.**

The law calls for people, businesses, and communities adversely affected by restrictions on commercial fishing in Glacier Bay to be compensated fairly. Because "fairly" is a relative term, public expectations about this compensation program vary widely. The National Park Service has used all information available to make this compensation as fair as possible.

Thank you for your help and interest in the Glacier Bay Commercial Fishing Compensation Program.

Sincerely,


Tomie Patrick Lee
Superintendent, Glacier Bay National Park

Appendix B
Page 3 of 26

AR0000000143

# Background

## Compensation Program History

**Commercial Fishing in Glacier Bay:** The marine waters within Glacier Bay National Park have been fished commercially since before the establishment of Glacier Bay National Monument in 1925. Controversy has surrounded the issue since Congress designated Glacier Bay a national park in 1980. The Wilderness Act precludes most forms of commercial activity in designated wilderness areas, and National Park Service (NPS) regulations prohibit commercial fishing in national park areas unless specifically authorized by law.

The Alaska Wildlife Alliance and American Wildlands filed a lawsuit in 1990 challenging the National Park Service's failure to bar commercial fishing from Glacier Bay National Park. In 1994 the court ruled that "there is no statutory ban on commercial fishing in Glacier Bay National Park provided, however, that commercial fishing is prohibited in that portion of (the park) designated as wilderness area." The ruling was interpreted to mean that the NPS had the authority to prohibit and/or control the activity through regulatory action.

In 1991 NPS proposed regulations to phase out commercial fishing in Glacier Bay National Park. At the State of Alaska's request, however, the Department of the Interior (DOI) refrained from issuing a final rule in 1993 and agreed to discuss the possibility of resolving the issue through a legislative approach with the State of Alaska and congressional staff. During 1993–1994, discussions were held on legislative and regulatory alternatives between the NPS, State of Alaska, and the Alaska congressional delegation.

From 1995–1997, NPS worked with the State of Alaska and stakeholders to attempt to negotiate and resolve the commercial fishing issue. The stakeholders included representatives of the commercial fishing industry, Native groups, and conservation organizations. These discussions increased understanding of the facts, interests, options, and potential obstacles relevant to any final solution, but failed to reach a consensus.

In April 1997 the National Park Service introduced proposed regulations that would authorize most commercial fishing to continue in outer waters and allow limited participation. Congress passed legislation addressing the issue before those regulations were adopted.

**Congressional Action:** The Omnibus Consolidated and Emergency Supplemental Appropriations Act for FY 1999 (Public Law 105-277, 112 Stat. 2681; hereafter, "the Act") was signed into law on October 21, 1998. Section 123 of the Act contained a variety of specific statutory requirements for the management or phase-out of commercial fishing in the marine waters within Glacier Bay National Park. Section 123 of the Act contained the following provisions:

- The NPS was directed to cooperate with the State of Alaska in developing a management plan for the regulation of commercial fisheries in Glacier Bay National Park. This management plan is to provide for continued commercial fishing in Park marine waters outside of Glacier Bay proper.

- The Act limited commercial fisheries within Glacier Bay proper to ring or pot fishing for Tanner crab, longlining for halibut and trolling for salmon. Participation in these commercial fisheries was limited to the lifetimes of individual fishermen who qualify for a Lifetime Access Permit.



Appendix _B_
Page _4_ of _26_

AR0000000144

- Certain areas of Glacier Bay proper were closed immediately to all commercial fishing or limited to winter season king salmon trolling by qualifying fishermen.

- The Act restated the statutory prohibition on commercial fishing within designated wilderness areas, most notably affecting the Beardslee Island Dungeness crab fishery.

- Section 123 authorized a buy-out program for qualifying Dungeness crab fishermen who had fished in designated wilderness waters of the Beardslee Islands and Dundas Bay. (This program has been largely completed by the NPS).

**Compensation for Others:** In March 1999, the Alaska Department of Fish and Game (ADF&G) released a preliminary economic *estimate* that estimated economic losses to affected parties resulting from the Act to be between $16 million and $23 million. On May 21, 1999 legislation amending Section 123 of the Act was passed by Congress and signed into law. This legislation (Section 501 of the 1999 Emergency Supplemental Appropriations Act (Public Law 106-31)) authorized the NPS to develop a program to "fairly compensate United States fish processors, fishing vessel crew members, communities, and others negatively affected by restrictions on fishing in Glacier Bay National Park." Section 501 appropriated $23 million were for a compensation program. This is a separate program from the buy-out previously authorized for qualifying Dungeness crab fishermen under Section 123 of the Act. The compensation approved under this newer legislation is not a buy-out program.

**Final Rule:** On October 20, 1999 the NPS published a Final Rule that implements the requirements of Section 123, as amended. These regulations established eligibility requirements and application procedures for qualifying fishermen to obtain a Lifetime Access Permit (LAP) for the three commercial fisheries authorized in Glacier Bay proper. In addition the rule stated that the NPS will administer, in a fair and timely manner, the $23 million compensation program provided in the Act.

After Oct. 1, 2000, only Tanner crab, troll salmon and halibut fishermen who meet the requirements for a LAP are authorized to fish in Glacier Bay proper. Commercial fishing in the Bay will close completely when the last of the LAP holders retires. The NPS is enforcing the commercial fishing closures in Park waters specifically closed by the Act.

**Public Involvement:** Congress did not provide specific criteria for disbursing the $23 million. The NPS and the State of Alaska recognized that public involvement would be a key element to structuring a fair compensation program. In October of 1999, NPS contracted with RESOLVE, a non-profit mediation organization, to in the design of a process with a high level of public involvement. The first stage began in the fall of 1999 with the lead facilitator making telephone calls and meeting with interested parties to discuss public involvement strategies.

The second stage was a series of informal open houses held in January and February of 2000 in Angoon, Gustavus, Haines, Hoonah, Juneau, Kake, Pelican, Petersburg, Sitka and Wrangell. The open houses were designed to provide an informal opportunity for people to share their ideas and concerns one-on-one with the National Park Service and the Alaska Department of Fish and Game regarding the compensation program. The open houses also provided an opportunity to submit formal written and verbal comments.

Numerous fishermen, crew members, fish processors, community and Native leaders attended these meetings. While those who attended discussed their personal financial losses, they also expressed concerns about the broader impact of closing Glacier Bay to fishing. These concerns included retaining their opportunity to fish, the displacement of fishermen resulting in crowding of

Appendix B
Page 5 of 26

other areas, lifestyle impacts, using the compensation money to benefit the fishing industry as a whole and concern over Glacier Bay as a precedent for future closures. These meetings were followed by the release of the Draft Compensation Plan in October 2000. Opportunity was given for public comment about the Draft Compensation Plan through a series of meetings held in November of 2000. A written summary of all of these meetings and public comment on the Draft Compensation Plan, as well as responses to Frequently Asked Questions, are available from the National Park Service.[1]

**Interim Dungeness Processor/Crew Member Compensation:** On July 29, 1999, the NPS responded to a Congressional request and established an interim compensation program for crab processors affected by the closure of designated wilderness waters to commercial fishing  On March 22, 2000, similar interim compensation was authorized for crew members employed by those Dungeness crabbers who were "bought-out" under terms of the Act. The rationale for this interim payment is that these parties were immediately affected by the closure of the Dungeness fishery. This interim compensation was intended to mitigate 1999 and 2000 income losses until the compensation program can be implemented.

**Economic Assessment:** Early on, it was recognized that an outside impartial assessment of the potential future economic losses was needed to ensure a compensation plan based on objective data. *In November 1999*, NPS contracted with McDowell Group, Inc. a Juneau based research and consulting firm, to assess the economic impact of the fishing restrictions on individuals, businesses, and communities. The resulting Economic Assessment (EA) Draft was released on May 15, 2000 (see Appendix, Economic Assessment Executive Summary). A series of facilitated public conference calls were held from late April through early June 2000 to consult with affected parties and discuss topics related to the EA and key issues that the compensation plan would address. McDowell Group attended the open houses throughout Southeast Alaska in January and February of 2000 to gather information to assist in their assessment and completed the final EA in early August 2000. This analysis identified the principal economic losses incurred as a result of restrictions on commercial fishing, and provided an assessment of the potential scope and effects of fishing restrictions in Glacier Bay; in particular the lifetime access permit system and eventual phase-out that will affect a portion of park waters. The EA serves as the guiding document for the distribution of funds in this compensation plan

---

[1] Copies of the open house summary are available through the National Park Service at 877-886-8831 (toll free) or on the Web at http://www.nps.gov/glba/learn/preserve/issues/fish/


Appendix B
Page 6 of 26

AR0000000146

# *The Compensation Plan Summary*

---

**Compensation Plan Summary**

This compensation plan is based on the following:

❑  Documented participation in a Glacier Bay commercial fishing activity during the years 1989-98, and proof of current participation for a permit holder, crew member or business (including employees).

❑  Compensation to permit holders is proportional to past earnings from Glacier Bay.

❑  Compensation for processors is proportional to past gross earnings from Glacier Bay production.

❑  Compensation for communities is determined by several factors, including (among others) number of resident Glacier Bay fishermen, proximity to Glacier Bay, percentage of residents' catch derived from Glacier Bay, and percentage of seafood processed locally from Glacier Bay.

---

Appendix B
Page 7 of 26

AR0000000147

# ·PART I
# Eligibility for Compensation

## Determining Eligibility

While many people *will be* able to show past participation in Glacier Bay fishing or processing, many others may have difficulty documenting economic losses associated with closing Glacier Bay to commercial fishing. Because of the difficulty of demonstrating actual losses, individual compensation is based primarily on a share of the past harvest. This plan is based on the presumption that the individuals most directly affected by current and future restrictions on commercial fishing in Glacier Bay are those with a recent history of participation in Glacier Bay fisheries.

## Active Participation

The purpose of distributing this money is to compensate for past, present and future losses, so it follows that there needed to be a way of identifying who is active in the industry. Distributing compensation to inactive fishermen, processors, and crew constitutes a serious challenge to the fairness of a compensation program that is intended to compensate for future loss — of which retirees (regardless of age) have none. The NPS has determined that proof of current participation in a fishery affected by Glacier Bay closures is required to qualify a permit holder, processor, or crew member for compensation.

## Crew Member Eligibility

Since crewmembers' pay is directly linked to permit holders' earnings, it was most practical to designate their qualifying period to be the same as permit holders in the same fishery.

One issue in determining crew eligibility concerned the possibility of a single individual earning compensation as both a crewman and as a permit holder. A person crewing in one fishery (halibut, for example) and fishing his own permit in another fishery (troll) would qualify for both crew and permit-holder compensation. But what about the individual who has earned income first as a crewmen, and then as a permit holder in the same fishery? Only future earnings as a permit holder would qualify for compensation, which is intended to cover *future* losses.

To maintain fairness, the NPS will allow individual application for both crew and permit holder compensation if an individual has a history of doing both concurrently.

## Summary of Eligibility Requirements

*   All commercial fishing permit-holders, crew members and processors (including employees) who can document earnings from Glacier Bay fishing activity during the years 1989-1998 and provide proof of current participation in an affected fishery or related business are eligible for compensation.

## PART II

# Distribution of Compensation among Categories of Claimants (Splitting the Compensation Pie)

All compensation calculations in this plan are based on the $23 million allocated by Congress to fund the compensation plan. This section defines how the Economic Assessment divides economic loss among participants in the commercial fishing industry and the method by which the applicable compensation amounts are distributed among and within categories of claimants.

## Distribution of Loss Among Categories

The NPS has determined that compensation will be guided by the Economic Assessment. Each fishery's loss is expressed as a percentage of the total loss, as determined by the Economic Assessment. For further discussion of this topic, see Economic Assessment Executive Summary in the Appendix.

## Distribution of Available Funds Among Categories

Once administrative costs[2] are deducted, the money will be split into individual funds for each category of affected parties. Categories of affected parties are permit holders, crew, processors, processor employees, support businesses and communities. The EA indicates the following distribution and compensation amounts.

**Table 1:**
**Distribution of Compensation**
**Among Categories of Affected Parties**
**($23 million available)**

|  | Percent Share Of Loss(From EA) | Compensation |
|---|---|---|
| *Harvest-Related Compensation* |  |  |
| Permit Holders | 30.3% | $6,969,000 |
| Vessel Crew | 12.3% | $2,829,000 |
| Subtotal | 42.6% | $9,798,000 |
| *Processing-Related Compensation* |  |  |
| Processors | 25.4% | $5,842,000 |
| Processor Employees | 5.9% | $1,357,000 |
| Fish Tax Revenue | 1.7% | $391,000 |
| Subtotal | 33.0% | $7,590,000 |
| *Support Businesses and others* | 11.3% | $2,599,000 |
| *Community Compensation* | 13.1% | $3,013,000 |
| **Grand Total** | 100.0% | $23,000,000 |

---

[2] Administrative costs for this compensation program are expected to be met with unobligated funds from the Dungeness Crab fishery buyout program.

It is important to recognize that the NPS cannot prioritize losses among these categories. According to the NPS interpretation of the law, all categories will be treated the same in the compensation plan, as the statute treated the categories the same. The compensation plan cannot first compensate permit holders and processors, then distribute whatever is left among crew, employees, support businesses, and communities.

## Distribution of Available Funds Among Categories

The EA also indicates how compensation should be distributed *within* each category. Table 2 below shows the percentage of the total compensation that will go to each group.

**Table 2:**
### Distribution of Compensation within Categories of Affected Parties
### (Percent of Total Compensation)

| | Tanner Pot | Tanner Ring | Halibut | Dungeness | Troll | Ground-Fish | King Crab | Total |
|---|---|---|---|---|---|---|---|---|
| *Harvest-Related* | | | | | | | | |
| Permit Holders | 15.1% | 1.5% | 5.2% | 5 1% | 1.6% | 1.3% | 0.5% | 30.3% |
| Vessel Crew | 7.2% | 0.2% | 0.8% | 3.3% | 0.1% | 0.4% | 0 3% | 12 3% |
| Subtotal | 22.3% | 1.7% | 6 0% | 8.4% | 1.7% | 1.7% | 0.8% | 42 6% |
| | | | | | | | | |
| *Processing-Related* | | | | | | | | |
| Processors | 8.3% | 0.7% | 0.8% | 12.4% | 0.4% | 2.5% | 0.3% | 25.4% |
| Fish Tax Revenue | | | | | | | | 1.7% |
| Processor Employees | | | | | | | | 5.9% |
| | | | | | | | Subtotal | 75.6% |
| *Support businesses and others* | | | | | | | | 11.3% |
| *Communities* | | | | | | | | 13.1% |
| | | | | | | | Total | 100% |

The individual fishery shares amount to 87 percent of total economic loss. The remainder of loss defined by the EA (13 percent) is loss to communities. Since the EA does not link community losses with specific fisheries, those losses are not apportioned among fisheries in this table. See Part III for a discussion of factors affecting losses to communities.

These percentages were applied to the $23 million compensation fund, resulting in the distribution shown in Table 3.



AR0000000150

Table 3.

## Distribution of Compensation Among Categories of Affected Parties
**(Amount of Compensation, Based on $23 Million Total Available)**

|  | Tanner Pot | Tanner Ring | Halibut | Dungeness | Troll | Ground-Fish | King Crab | Total |
|---|---|---|---|---|---|---|---|---|
| *Harvest-Related* | | | | | | | | |
| Permit Holders | 3,473,000 | 345,000 | 1,196,000 | 1,173,000 | 368,000 | 299,000 | 115,000 | 6,969,000 |
| Vessel Crew | 1,656,000 | 46,000 | 184,000 | 759,000 | 23,000 | 92,000 | 69,000 | 2,829,000 |
| Subtotal | 5,129,000 | 391,000 | 1,380,000 | 1,932,000 | 391,000 | 391,000 | 184,000 | 9,798,000 |
| *Processing-Related* | | | | | | | | |
| Processors | 1,909,000 | 161,000 | 184,000 | 2,852,000 | 92,000 | 575,000 | 69,000 | 5,842,000 |
| Fish Tax Revenue | | | | | | | | 391,000 |
| Processor Employees | | | | | | | | 1,357,000 |
| Subtotal | | | | | | | | 7,590,000 |
| *Support businesses/others* | | | | | | | | 2,599,000 |
| *Communities* | | | | | | | | 3,013,000 |
| *Total Compensation* | | | | | | | | 23,000,000 |

Note. Totals in Table 3 may not match totals in Table 1 due to rounding.

The distribution in Table 3 highlights the effect of the International Pacific Halibut Commission's determination that closure of Glacier Bay is unlikely to result in a reduction in the Area 2C halibut quota. While the annual value of the Glacier Bay halibut and Tanner fisheries are nearly equal, losses (and therefore compensation) in the Tanner fishery are several times greater than in the halibut fishery. ADF&G has stated it will reduce the Tanner guideline harvest level for the region over time as a result of Glacier Bay closures (see the Economic Assessment for a detailed discussion of this issue).

With these dollar values designated for each group within each category, the next step is to identify individual compensation amounts (or shares), as described in the next chapter (Part III <u>Mechanics of the Compensation Plan</u>).

AR0000000151



# PART III
# Mechanics of the Compensation Plan
### *Individual Permit Holder Compensation*

The mechanics of the plan are the same for all fisheries with respect to compensation for historical harvest. The mechanics are best described with an example from the Halibut fishery. The computation begins with the amount of money designated for Halibut permit holders ($1,196,000, as indicated in Table 3 above).

To illustrate the compensation plan mechanics, suppose a hypothetical Halibut fisherman, John W., has harvested 22,250 pounds of halibut during the ten-year period over which halibut harvests are calculated (1989-1998). This harvest represents 0.74 percent of the total harvest of Halibut from Glacier Bay during that ten-year period by those applying for and receiving compensation. John W., with 0.74 percent of the harvest between 1989-1998, is entitled to 0.74 percent of $1.196 million, or $8,850.00. All compensation amounts will be calculated as a percentage of the total catch, as reported by applicants. *Each applicant will then qualify for an equivalent percentage of the compensation designated for that category as calculated in the Economic Assessment.* The percentage will be taken out to two decimal places, and compensation amounts will be rounded to the nearest dollar. This methodology is tabulated in Table 4. Detailed documentation requirements are provided on page 17.

Table 4:
Halibut Sample Compensation Calculations

| | |
|---|---|
| Total compensation payable to Halibut permit holders: | $1,196,000 |

*Individual Compensation Calculations*

| Permit Holder's Name: | John W. |
|---|---|
| **Individual Glacier Bay Harvest History** | **Harvest Value (Lbs.)** |
| 1989 | 3,000 |
| 1990 | 0 |
| 1991 | 0 |
| 1992 | 2,000 |
| 1993 | 6,500 |
| 1994 | 0 |
| 1995 | 4,000 |
| 1996 | 3,750 |
| 1997 | 3,000 |
| 1998 | 0 |
| *10-year total* | 22,250 |
| **Total Glacier Bay Harvest** 10-year total, All Permit Holders Receiving Compensation | 3,005,140 |
| **John's Share of Total Harvest** | 0.74% |
| **Compensation due to John** | $8,850.00 |



AR0000000152

## *Individual Crew Compensation*

Crewmembers will need to document earnings from their participation in a particular Glacier Bay fishery to be eligible for compensation. These individual earnings will represent some share of the collective crew shares during th

e baseline period for each fishery. Compensation payable to the individual crewman will be calculated as a share of the compensation amount set aside for crew in each specific fishery, using the same method as for permit holders. Total Glacier Bay crew earnings will be the total dollar amount earned by crewmembers for each fishery based on claims submitted. *Each applicant will then qualify for an equivalent percentage of the compensation designated for that category as calculated in the Economic Assessment.* Detailed documentation requirements are provided on pages 17 and 18.

### Table 5:
### Sample Compensation Calculations
### Tanner Pot Crew

| | |
|---|---|
| *Total compensation payable to Tanner pot crew:* | $1,656,000 |

*Individual Compensation Calculations*

| Crewman's Name. | Steve H. |
|---|---|
| *Individual Glacier Bay Earnings History (Gross Earnings)* | *Gross Earnings* |
| 1989 | 1,500 |
| 1990 | 1,200 |
| 1991 | 3,000 |
| 1992 | 0 |
| 1993 | 2,300 |
| 1994 | 1,000 |
| 1995 | 2,000 |
| 1996 | 500 |
| 1997 | 2,000 |
| 1998 | 0 |
| *Total Earnings* | $13,500 |
| *Total Glacier Bay Crew Earnings** | $1,641,010 |
| *Steve's Share of Total Crew Earnings* | 0.82% |
| *Compensation payable to Steve H.* | $13579.00 |

*This number is an example and does not represent the actual earnings of Glacier Bay crewmembers for the Tanner Pot fishery.*

B
13 of 26

AR0000000153

## Individual Processor Compensation

Losses to processors will work in generally the same way as for permit holders, except that gross profit from Glacier Bay fish processed will be the foundation for compensation rather than pounds caught. Each processor will document past production of Glacier Bay fish or crab through fish tickets, CFEC reports, or both. The individual processor's compensation will be based on share of the total gross profit processed for each species, as reported by applicants. For example, suppose a Dungeness processor processed $350,000 (gross profit) worth of Dungeness crab over the 1989 to 1998 period. Further assume that the total gross profit of Glacier Bay Dungeness crab processed over the same period was $2,852,000. *In this case, the processor would receive 12.27 percent of the compensation set aside for all Dungeness processors. That 12.27 percent would then be multiplied by the total amount set aside for Dungeness processors, $2,852,000, to become $349,940 in compensation (remember that all percentages will be carried out to two decimal places, and all dollar amounts rounded to the nearest dollar).* Detailed documentation requirements are provided on pages 17 and 19.

## Individual Processor Employee Compensation

Compensation calculations for processing employees will follow that same basic framework. Individual employees will document income earned while working for processors handling Glacier Bay seafood during the qualifying period. This income will represent a percentage of total income earned by processing employees, which will qualify that individual for an equivalent percentage of the compensation designated for that category (as calculated in the Economic Assessment). Detailed documentation requirements are provided on pages 17 and 20.

## Individual Support Businesses and Other Compensation

This broad category includes (1) businesses that directly provide goods and services to Glacier Bay fishermen and processors, (2) businesses that have an indirect relationship with Glacier Bay fishing that can demonstrate economic loss resulting from commercial fishing restrictions and closures, and (3) other legitimate claimants not identified in any other category. A typical business in category 1 includes, but is not limited to, packers, marine repair shops, airfreight transporters and owners of commercial fishing boats leased to Glacier Bay fishermen. A typical business in category 2 includes, but is not limited to, restaurants, hotels and grocery stores. Compensation for businesses in all categories will be based on documented financial interest in Glacier Bay commercial fishing. Detailed documentation requirements are provided on pages 17 and 20.

## Community Compensation

Communities will receive compensation in two ways: compensation for documented raw-fish tax losses, and compensation for indirect or induced economic impacts. Of the $23 million in total compensation available to all parties, $3 million is allocated for community compensation (not including raw fish tax compensation). In order to receive compensation, communities must only





AR0000000154

submit a formal request for compensation from the mayor, city council or, in the case of unincorporated communities, the State-recognized community leadership.

Compensation for lost fish tax revenue will be based on documented local processing of Glacier Bay fish. Communities will need to identify the value of past fish tax revenue from Glacier Bay fish (see Documentation Requirements). Similar to the framework outlined above, communities would calculate their annual average revenue from fish taxes over the baseline period. This average would determine each community's share of the total amount of money set aside to compensate communities for lost fish tax revenues.

Compensating communities for indirect and induced economic losses is a more difficult task. Primary considerations for determining compensation to communities include the number of Glacier Bay fishermen residing in the community, proximity to Glacier Bay, Glacier Bay fish landed by local fishermen, and Glacier Bay fish processed by local processors..

It is important to understand that there is no purely objective way to determine how community compensation money should be distributed. There simply is no way to predict how each community will be affected by closure of the bay and how those affects might be mitigated through compensation. Because of this uncertainty, the NPS is using a point system to determine how much compensation each affected community will receive.

The first step is to assign points to each community according to four criteria; proximity to Glacier Bay fishing grounds, number of Glacier Bay fishermen, ratio of Glacier Bay catch to total catch, and ratio of Glacier Bay seafood processed to total seafood processed. More specifically, these criteria are defined as follows:

- **Proximity:** Proximity points will be based on a formula of 100 less the distance to the fishing grounds in water miles. Communities that are more than 100 miles from the mouth of Glacier Bay will receive no points for proximity. Including proximity points is intended to mitigate loss factors related to proximity, such as fuel and grocery sales and other local business losses that would not occur if Glacier Bay were to remain open to commercial fishing.

- **Glacier Bay Fishermen:** Commercial fishing permits with Glacier Bay history, divided by two. This factor will include all troll permits with any history of area 114 landings as well as all other permits with a Glacier Bay history. For example, city A has 250 permits with a Glacier Bay history. They would then receive 125 points for Glacier Bay fishermen (all numbers will be rounded up). This factor is included to compensate for the total number of fishermen in a community who fish Glacier Bay. This factor is weighted because it is recognized that the number of residents with Glacier Bay fishing history does not necessarily mean that a community has a proportional dependence on Glacier Bay and that area 114 for Salmon Trolling encompasses far more than Glacier Bay..

- **Glacier Bay Fish Landed:** Percentage of Glacier Bay fish landed as a percentage of total harvest by community. This will measure the total amount of Glacier Bay fish landed by local fishermen as a percentage of the total amount of fish landed by a community's fleet. For example, city B's fleet lands an average of 200,000 lbs. worth of Glacier Bay fish over the



qualifying period out of a total average of 500,000 lbs. City B would then receive 40 points for Glacier Bay fish landed.

- **Glacier Bay Fish Processed:** Percentage of Glacier Bay fish processed as a percentage of total fish processed in a community.

The purpose of the above point system is to estimate the dependence a community has on Glacier Bay commercial fishing. Compensation will be distributed based on each community's percentage of total points received from the applying communities. Points will be calculated by NPS staff using data provided by ADF&G for Glacier Bay fishermen and Glacier Bay fish landed. Proximity will be calculated by NPS staff using nautical charts to plot distance from the mouth of Glacier Bay to each applying communities' harbor using the shortest route possible by water. Communities may want to work with local processors to gather information regarding Glacier Bay fish processed and submit that information to the National Park Service in order to assist in gaining full consideration for that criteria.

AR0000000156

# PART IV
# Complexities in the Compensation Plan

## The Tanner Crab Ring Net Fishery

Glacier Bay fishing restrictions, for all practical purposes, end the Tanner crab ring net fishery in Glacier Bay. Closure of wilderness waters and additional areas results in loss of nearly all productive Tanner crab ring net fishing grounds within Glacier Bay. The gear used in the ring net fishery is not practical in waters deeper than 40 fathoms. Most waters remaining open to LAPs in Glacier Bay are well over 40 fathoms in depth or are subject to high current velocity, which renders the gear impractical. Due to these facts, Tanner ring fisheries will be compensated on the basis of a total loss of harvest.

## The Tanner Pot Fishery

*In addition to compensation for lost harvest,* the Tanner pot fishery will experience direct impacts as a result of guideline Harvest level (GHL) reductions commensurate with Lifetime Access Permit (LAP) holder's rate of retirement from the Glacier Bay fishery. According to ADF&G, as the Glacier Bay harvest declines, the GHL for Southeast Alaska will be reduced. Asset values could decline along with total profitability of the fishery as the GHL is reduced, resulting in a regional decline in permit values for all permit holders regardless of Glacier Bay fishing history.

CFEC places current T19A permit values at $116,900*. Multiplying this $116,900 permit value by the 93 permits (permanent and interim) fished in 2001 results in a total value for all permits of $10.9 million. If the GHL is reduced by 10%, the total value of permits could eventually, as the Glacier Bay Harvest declines over time, drop to about $9.8 million; a loss of about $1.1 million. Analysis by McDowell Group, Inc., indicates that the present value of the lost permit values is about $847,000.

As a result of the above analysis, all Southeast Alaska Tanner pot permit holders will be compensated in part for lost permit value. $847,000 out of the pool of funds designated for compensation of Tanner Crab permit holders will be used to reduce the number of active permits, thereby reducing competition and negating the "displacement effect" caused by restrictions in Glacier Bay. A sealed low bid process will be used to identify the permits to be retired. A maximum number of 10 permits will be retired, and a minimum of seven permits must be retired to trigger this permit reduction process. Any funds leftover from this permit reduction will be distributed equally among qualifying Southeast Alaska Tanner pot permit holders. *The bidding will begin with the opening of the compensation application period and end with the close of that same period. The "winning" bidders, if any, will be notified by mail as soon as possible after the close of bidding. Permit retirement through this program will not preclude applicants from applying for and receiving other compensation monies, if qualified.* If the permit reduction is not successful, and the minimum number of permits are not eliminated, then all funds in this pool will be distributed equally among all qualifying Tanner pot permit holders. See page 17 for claim submission requirements for Tanner pot permit value loss compensation.

*B*
*17 - 26*

AR0000000157

,ᶜ There is uncertainty about the value of Tanner crab permits. Permit sales are infrequent and permit prices fluctuate with annual earnings. The CFEC permit value of $116,900 is the average of the last four market exchanges, one of which occurred in 1993, rather than the amount of the most recent market exchange

# PART V

# OMB Control Number: 1024-0240

Applicants for compensation under this plan are not required to respond to this collection of information unless the currently valid OMB Control Number is displayed in a manner that is reasonably calculated to inform the public. 5 CFR 1320.5(b)

# Claim and Payment Processes

## Filing a Claim for Compensation

To apply for compensation through the Glacier Bay Commercial Fisheries Compensation Program, an individual, business (partnership or corporation), or community must file an application with NPS offices in Juneau or Gustavus at one of the following addresses:

| *Glacier Bay National Park* | *Glacier Bay National Park* |
|---|---|
| *Juneau Field Office* | *PO Box 140* |
| *2770 Sherwood Lane #1* | *Gustavus, AK 99826* |
| *Juneau, AK 99801* | |
| | |
| *877-886-8831 Toll Free* | *907-697-2230 Superintendent* |
| *907-586-7047 Manager* | *907-697-2654 Fax* |
| *907-586-7078 Fax* | |
| | *Website:* |
| *e-mail:* GLBA_comm_fishing@nps.gov | http://www.glba.nps.gov/glba/learn/preserve/issues/fish/ |

Application instructions will be available from these NPS offices by September 28, 2001. Applications must be received (if delivered by other than the U.S. Postal Service) or postmarked by January 28, 2002. The application period is limited because all claims must be considered before any final decision regarding compensation allocations can be made or any compensation can be paid. Applications received after January 28, 2002 will be rejected without being considered.

## Documentation Requirements

Pursuant to Section 123 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act (Pub. L. 105-277, October 21, 1998), as amended by Section 501 of the 1999 Emergency Supplemental Appropriations Act (Pub. L. 106-31, May 21, 1999), the National Park Service has prepared a plan for distributing compensation to individuals, businesses and communities *negatively* affected by commercial fishing restrictions in Glacier Bay. The plan requires you to submit certain documentation necessary to demonstrate your eligibility to receive compensation, and calculate your individual compensation payment.





**The deadline for submitting documentation is January 28, 2002.** However, you are encouraged to submit your *documentation (described below)* as soon as possible to avoid delays in processing.

Please provide the following requested information to: Program Manager, Compensation Program Application, Glacier Bay National Park and Preserve, 2770 Sherwood Lane, Suite I, Juneau, AK 99801 (Phone: 907-586-7027)

*Eligibility Criteria and Documentation Requirements*

Information *required from all parties seeking compensation* includes:

- Full Legal Name
- Business Name (if applicable)
- Physical Address
- Mailing Address
- Phone number
- Fax number (if applicable)
- Email address (if applicable)
- See specific category for additional corroborating documentation requirements

## ELIGIBILITY AND DOCUMENTATION REQUIREMENTS FOR PERMIT HOLDERS

### Eligibility Criteria

- Currently owns an Alaska limited entry permit, or IFQ share, for each fishery for which compensation is being sought.
- A history of commercial fishing in Glacier Bay proper for each fishery for which compensation is being sought during the qualifying eligibility period (1989-1998).
- Specific to the Tanner Crab pot fishery:
  - To qualify for compensation for predicted permit value loss, a permit holder must submit a notarized, personal affidavit stating that they hold a current permit, and are seeking compensation for lost permit value. They must also submit a copy of their current State of Alaska Limited Entry Permit for the Tanner pot fishery. This payment will be available to all Southeast Alaska Tanner pot permit holders.
  - A proposal put forth by the public suggesting that this pool of funds be used to reduce the number of active permits, thereby reducing competition and negating the "displacement effect" caused by the new restrictions on commercial fishing in Glacier Bay, has been adopted. Those wishing to participate in the permit reduction sealed bid process must submit a notarized, personal affidavit attesting to their ownership of a Southeast Alaska Tanner crab pot permit and their bid amount, as well as proof of ownership of a current Southeast Alaska Tanner crab pot permit.

Documentation of commercial fishery harvest from Glacier Bay Proper is important for calculating individual compensation amounts. Compensation for historical catch is based on an individual's proportion of the overall Glacier Bay harvest *as calculated in the Economic Assessment*, as reported by compensation applicants, of any given species during the qualifying eligibility period (1989-1998).

Information *required from all permit holders* seeking compensation:

- Name of vessel(s) fished in Glacier Bay during the 1989-98 period (indicate if you owned or leased the vessel)
- Copy of current permit for each fishery for which you are seeking compensation (Tanner pot, Tanner Ring, halibut, Dungeness crab, power troll, hand troll, King crab, and/or groundfish)
- Documentation of your annual Glacier Bay harvest (total pounds) for each fishery for which you are seeking compensation. This documentation should include a Commercial Fisheries Entry

Commission (CFEC) report (or copies of fish tickets) for your landings for each fishery for each year, 1989-98. You may supplement this data with logbook data if you feel that CFEC data is inaccurate or incomplete. Submit any other information you have that may give the NPS an accurate assessment of the value of your Glacier Bay harvest for the years 1989-98.

When requesting catch data from CFEC, permit holders in the crab fisheries must request harvest and value data (for statistical areas 114-60, 114-70 through 75, and 114-77. Trollers' Glacier Bay harvest is included in area 114. Because area 114 includes waters outside of Glacier Bay, CFEC harvest data for area 114 alone will not be sufficient to document losses. Trollers must provide logbook data or additional documentation concerning their Glacier Bay harvest. Halibut fishermen must provide their harvest data for area 184, for the years 1992 to 1998. Halibut fishermen wishing to gain consideration for harvest before 1992 will need to provide logbook data or other documentation. The groundfish statistical areas for Glacier Bay are 365830, and portions of 365804 and 355801. A signed and notarized release of information form must be submitted to CFEC before they can release your information. ***This catch data information must then be sent by applicant/requester to the National Park Service Juneau Field Office.***

To request a CFEC report of your harvest from Glacier Bay, complete the attached CFEC Request for Fish Ticket Information form and mail it to: CFEC, 8800 Glacier Hwy. #109, Juneau, AK, 99801. Forms may also be found at www.cfec.state.ak.us or by calling CFEC at (907)789-6160. The cost of a CFEC harvest report is $22.

- A notarized affidavit providing a summary of your annual Glacier Bay harvest (pounds) for each year during the 1989-98 period for each fishery for which you are seeking compensation. Only one affidavit is required if you are seeking compensation for more than one fishery. ***However, in your affidavit you must provide your annual earnings for each Glacier Bay fishery in which you participated.***

### ELIGIBILITY AND DOCUMENTATION REQUIREMENTS FOR COMMERCIAL FISHING CREW MEMBERS

### Eligibility Criteria

- Current participation in the fishing industry as evidenced by ownership of a current State of Alaska crewmember license, or a CFEC limited entry permit for any fishery. (A CFEC permit doubles as a crewmember license under Alaska Department of Fish & Game regulations.)
- Some level of participation in fishing activities in Glacier Bay proper for each fishery for which compensation is being sought during the qualifying eligibility period (1989-1998).

Documentation of crewmember earnings from Glacier Bay proper is important for calculating individual compensation amounts. Compensation for crewmembers is based on an individual's proportion of the overall Glacier Bay crewmember earnings during the qualifying eligibility period (1989-1998).

### Information *required from all commercial fishing crew* seeking compensation:

- Name of vessel(s) you fished on in Glacier Bay from 1989-1998.
- Name and phone number of skippers that you fished for in Glacier Bay during these years.
- 1099 or W-2 forms for each year you fished in Glacier Bay.
- A notarized affidavit from each skipper indicating the percentage of your earnings for each year (as indicated on your 1099 or W-2 tax forms) that can be attributed to your work in Glacier Bay. If this information is unavailable because the skipper is deceased, incarcerated or otherwise unreachable, we will accept a notarized affidavit from the applicant attesting to the estimated percentage of earnings derived from Glacier Bay.

AR0000000161



- Reports from ADF&G showing crewmember fishing license history or CFEC permit history for the years applicable to the compensation claim. Crewmember license history information is available from: Alaska Department of Fish and Game, Licensing Section, P.O. Box 25525, Juneau, AK, 99802-5525 or by phone at (907)465-2376.
- Any other information you may have that will give the NPS an accurate assessment of your crew earnings from commercial fishing in Glacier Bay during the years 1989-98. This might include logbook data, income tax returns, affidavits from fellow crewmen or other information.
- Notarized affidavit providing a summary of your annual earnings from Glacier Bay for each year during the 1989-98 period for each fishery for which you are seeking compensation. If you are seeking compensation for more than one fishery, only one affidavit is required. However, in your affidavit you must provide your annual earnings for each Glacier Bay fishery in which you participated.

## ELIGIBILITY AND DOCUMENTATION REQUIREMENTS FOR PROCESSORS

### Eligibility Criteria

- Some level of production of fish or crab harvested from Glacier Bay Proper during the eligibility period (1989-1998).
- Current participation as a seafood processor as evidenced by a current/valid State of Alaska Fisheries Business License for primary fish buyers/processors.
- Currently wholly US owned.

### Information _required from all seafood processors_ seeking compensation:

- Business name(s) and license(s) under which fish or crab were purchased from Glacier Bay fishermen
- CFEC data, or copies of fish tickets, providing gross poundage fish purchased by your company that was harvested in Glacier Bay, for each species for each year during the 1989 to 1998 period.
- Copies of your Commercial Operators Annual Report (COAR) for each year that your business purchased Glacier Bay fish.
- If you feel that your business has suffered economic damages beyond what are reflected by your gross revenue per net pound, provide supporting documentation.
- A notarized affidavit summarizing the volume and value of your business's documented production of Glacier Bay fish.

## ELIGIBILITY AND DOCUMENTATION REQUIREMENTS FOR PROCESSOR EMPLOYEES

### Eligibility Criteria

- Current employment at seafood processing facility. Current employment is defined as being employed at a Southeast Alaska seafood processing facility during the 2001 season.
- Past income derived from processing fish harvested in Glacier Bay during the eligibility period (1989-1998).



AR0000000162

*Information __required from all seafood processor employees__ seeking compensation:*

- Copies of your W-2 forms from those processing companies for each year you processed Glacier Bay fish.
- A notarized affidavit from you summarizing your job responsibilities the duration of your employment and what role you played in processing Glacier Bay fish.
- A notarized affidavit from the processor attesting to your employment during the qualifying years (1989-1998) and what estimated portion of your yearly earnings from that employer is attributable to product harvested in Glacier Bay proper. *If this information is unavailable because your former employer is deceased, out of business, incarcerated or otherwise unreachable, we will accept a notarized affidavit from the applicant attesting to the estimated percentage of earnings derived from Glacier Bay.*

## ELIGIBILITY AND DOCUMENTATION REQUIREMENTS FOR SUPPORT BUSINESSES

### Eligibility Criteria

- Some level of economic dependence on commercial fishing/processing activities resulting from fish harvested in Glacier Bay proper during the qualifying period (1989-1998).
- This category includes any business providing direct goods or services to commercial fishermen or seafood processors who relied on Glacier Bay fish. This could include, but is not limited to, packers, businesses providing repair or transportation services, or boat owners who have leased boats to fishermen who fished in Glacier Bay during the 1989-1998 eligibility period. This category also includes business providing indirect goods or services to commercial fishermen or seafood processors who relied on Glacier Bay fish. This could include, but is not limited to restaurants, laundries, and grocery stores. Further, this category is intended to encompass any individual or business not included in one of the categories listed above.

*Information __required from all support businesses__ seeking compensation:*

- Business name (or names) under which your business was operated.
- Copy of State of Alaska business license(s) or State of Alaska business license numbers under which your support business was operated, including the business activity code.
- A notarized affidavit describing your business' direct and/or indirect dependence on commercial fishing in Glacier Bay during the 1989-1998 eligibility period.

### Recommended sources of supporting documentation:

- Profit and loss statements, tax returns, receipts, invoices or other accounting information from the years (1989 through *1998*) prior to and following Glacier Bay commercial fishing restrictions.

## ELIGIBILITY AND DOCUMENTATION REQUIREMENTS FOR COMMUNITIES

Communities will be eligible for compensation in two areas; compensation based on lost fish tax revenue, and/or compensation for diminished local economic activity. Compensation for lost fish tax revenue is available only to communities that have earned such revenue in the past. Communities

---

Compensation Plan
Glacier Bay Commercial Fishing Compensation Program

Page 21
National Park Service



AR0000000163

seeking this compensation must provide documentation of total purchases of Glacier Bay fish by local processors for each year 1989-98.

Communities will also be compensated on the basis of points for other lost economic activity. The point system was discussed in Section III *(pages 12-14)*. In order to receive compensation in this manner, a community must apply for such compensation through an official, written request for compensation from either the mayor or the city council or (in the case of unincorporated communities) the State of Alaska recognized community or town council. **This portion of compensation will be calculated by the NPS as described in Section III (pages 12-14).**

## Claim Review and Determination

The superintendent of Glacier Bay National Park will make the final determination for each application, including both eligibility and compensation based on the compensation plan and the information and documentation provided by the applicant.

## Compensation Payment

All applicants that are determined eligible will receive some level of compensation. The amount of compensation paid to an eligible applicant will be determined by the allocations detailed in this compensation plan as informed by the Economic Assessment. Eligible applicants will receive a decision from the superintendent regarding their eligibility and the estimated compensation amount. Ineligible applicants will be notified at the same time that they are not eligible to receive compensation.

No payments will be made to any applicant until all administrative appeals are decided. Due to the fixed amount of the total compensation available, NPS needs to consider and decide all appeals together before payment amounts are known. Decisions on appeals could result in changes to individual compensation amounts. Therefore, no claims can be paid until all appeals are decided. Instructions on payment procedures will be provided to each eligible applicant. The federal government is required to use electronic payment procedures. Payment will be made in the form of one lump sum or, at the recipients' option, over a two- or three-year period.

## Appeals

Any applicant will have the right to appeal the superintendent's decision regarding eligibility for compensation or the amount of compensation awarded under the compensation program. *Appeals must be made to the Regional Director, Alaska Region, 2525 Gambell St., Anchorage, AK, 99503.* The appeal must be physically received if delivered other than by U.S. mail, or postmarked if sent by U.S. mail, no more than 60 days from the *postmark* date of determination letters. An applicant who appeals must substantiate the basis of their disagreement with the superintendent's decision. An opportunity for an informal oral hearing with a hearing officer will be provided at the applicant's request. After consideration of written and oral hearing materials prepared by the hearings officer, the NPS Alaska Regional Director will affirm, reverse or modify the superintendent's decision and explain the basis of the decision in writing. The regional director's decision will be the final NPS action in the appeal process.





AR0000000164

AR0000000165

B
25 26

# APPENDICES

*Economic Assessment Executive Summary*

*Copy of the Act (Federal Register Notice)*